J-S73034-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL MCMILLAN | : | |
| | : | |
| Appellant | : | No. 735 WDA 2018 |

Appeal from the Judgment of Sentence October 26, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0006930-2007

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY OLSON, J.: FILED FEBRUARY 13, 2019

Appellant, Michael McMillan, appeals from the judgment of sentence entered on October 26, 2017 in the Criminal Division of the Court of Common Pleas of Allegheny County.[1] We affirm.

The trial court offered the following summary of the facts introduced at trial:

Rachel Larue testified that she was present in her residence on April 17, 2007. At that time, she became aware that [Appellant] was also in her residence on an upstairs floor playing video games with her son, Will Smoot, and another person identified as [James Maurice Jones aka "Reese"]. Upon learning that [Appellant] was in the house, [Larue] went upstairs and advised [Appellant] he had to leave. [Larue explained that Appellant was no longer permitted in her home due to a prior incident in which he brandished a firearm inside the residence. Larue therefore] escorted [Appellant] partly out of her house and she then went

_____

[1] Appellant's judgment of sentence was made final when his post-sentence motions were denied by operation of law in an order entered on March 9, 2018.

into her bedroom. Shortly after she entered her bedroom, she heard four or five gunshots and the sounds of scuffling. She was also able to smell what she termed "gun smoke." As she quickly moved toward the upstairs room she observed [Appellant] running down her stairway, jumping between landings, carrying what appeared to be a gray [nine-millimeter] handgun. [Larue] observed [her son] lying on the ground suffering from an apparent gunshot. She ran from the house and began to chase [Appellant]. She was not able to catch him.

Jessica Stewart Logan, [Smoot's girlfriend], testified. She testified that she was in the residence at the time of the shooting. She testified that just prior to the shooting, she heard what sounded like a bunch of chairs being moved around upstairs. She then heard what she believed to be five or six gun shots coming from the direction of [Smoot's] room. She then observed [Appellant] run down the stairs with a gun in his hand. She[, along with Larue,] ran to the attic room and tended to [Smoot], who was bleeding from his nose and mouth. She observed Reese in the corner of the room apparently suffering from a gunshot wound. [Logan] then called 911. [Smoot] was pronounced dead at the scene, a victim of homicide. He suffered a gunshot wound to his head. Reese also suffered gunshot wounds.

Krystal Hall also testified that just after the shooting, she observed [Appellant] running down McClure Street "like he was scared." She observed him enter a residence on McClure Street. She then entered her residence. She remained in her residence with her friend, Belinda. A short time later, [Appellant] came to her residence and asked if he could stay there for a short time. He had a cigarette there. He was wearing different clothes than he was wearing when she observed him running. According to [Hall, Appellant] appeared very nervous. She asked him why he was nervous and he responded that he had tried to "come up off of some niggas." Upon questioning from defense counsel, [Hall] testified that the phrase was street slang for trying to rob somebody. [Appellant] then told [Hall] that he shot [Smoot] in the head and shot Reese in the arm. [Appellant] then locked [Hall] out of her house for some time while police helicopters were hovering over the residence.

Officer Jeffrey Snyder of the Homestead [Police Department] testified in this case that he was the first officer to respond to the scene of the shooting. [In the room where the shooting occurred, he observed a] substantial amount of money, approximately

$1,400[.00,] scattered all over the room. Shell casings were about the floor [and t]he furniture in the room was scattered.

Allegheny County Detectives also responded to the scene. After being advised that [Appellant] had entered a residence on McClure Street just after the shooting, the detectives searched that residence. There they found boots with blood stains, blue jeans, cell phones and a hair brush. Forensic DNA testing was performed on some of this evidence and [Smoot's] DNA was found on the boots and pants belonging to [Appellant].

[Appellant] testified in his own defense. He testified that on the date in question, he was at [Smoot's] house playing computer games with [Smoot] and Reese. He testified that he had been a customer of [Smoot's] and had purchased crack cocaine from [Smoot] in the past. [Appellant] testified that on April 17, 2007, after being at [Smoot's] residence for approximately [three] hours, he began to have a conversation with Reese about "Alexandra," Reese's girlfriend. According to [Appellant], in the past, there had been an incident in which Reese and [Appellant] exchanged words over [Appellant's] attempted contact with Alexandra while she and Reese were dating. Sometime after the telephone conversation, [Appellant] testified he met Reese on the streets. According to [Appellant], at the time of the meeting neither [Appellant] nor Reese apparently recalled the prior conversation about Alexandra. They became social acquaintances. [Appellant testified that, o]n the date of the shooting, [he] and Reese met on the street. Reese advised [Appellant] that he was going to [Smoot's] house to buy some "weed." The two men went to [Smoot's] house together.

[Appellant] then testified that he went to [Smoot's] residence where he smoked marijuana with Reese. [Appellant] and Reese then went up to [Smoot's] room in the attic where they hung out and played computer games. At some point, [Larue] came home and, after determining that [Appellant] was in the residence, she asked him to leave. He testified that he started to walk down the stairs to leave but that he realized he forgot his cell phone. He then went back upstairs. While upstairs, [Smoot] addressed [Appellant] about concerns that [Appellant] disrespected [Smoot's] mother. According to [Appellant], Reese then began to ask [Appellant] about Alexandra. [Appellant] testified that he told Reese that he got Alexandra pregnant. [Appellant] testified that as he began to walk away he heard a chair move and then he was punched in the back of the head by Reese. When he fell, a gun

- 3 -

he had in his sweatshirt fell out [] and slid across the floor. [Appellant] testified [that] Reese moved toward the gun. [Appellant] then recalled that Reese was the person he had the discussion with earlier about Alexandra. According to [Appellant], Reese grabbed the gun. [Smoot] told Reese to "chill." Reese then cocked the gun and pointed it at [Appellant]. [Appellant] testified that he attempted to grab Reese's arm to move the gun from being pointed at him. According to [Appellant], the gun accidentally discharged and delivered the fatal shot to [Smoot]. [Appellant] claimed that gun powder filled his eyes and his eyes were burning but he was able to grab his gun. Reese then took off running toward the entertainment center. [Appellant] believed Reese was trying to retrieve a gun. [Appellant] then fired his gun at Reese, hitting him in his left lower back. Reese shot his gun but missed [Appellant]. [Appellant] shot again, this time grazing Reese across the chest and arm. [Appellant] was able to grab Reese's gun. He checked on [Smoot] and fled the scene with both guns. He admitted that he fled the scene, hid the guns, [and] went to a residence to change his clothes. He also admitted that he made telephone calls to person in an effort to help him flee.

Trial Court Opinion, 5/16/18, at 3-6 (footnotes in original omitted).

On April 29, 2008, a jury found Appellant guilty of one count each of second-degree murder, robbery, aggravated assault, and possession of a firearm by a minor. Thereafter, on July 16, 2008, the trial court sentenced Appellant to life without parole for the second-degree murder conviction, ten to 20 years each for the robbery and aggravated assault convictions (to be served consecutive to the life sentence but concurrent to each other), and two and one-half to five years for minor in possession of a firearm (to be served consecutive to the sentences for robbery and aggravated assault).

Appellant filed a direct appeal from the judgment of sentence. This Court affirmed Appellant's judgment of sentence on May 5, 2010.

Commonwealth v. McMillan, 4 A.3d 183 (Pa. Super. 2010) (unpublished memorandum). Appellant did not seek further review.

On February 14, 2011, Appellant filed a timely pro se petition under the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. The PCRA court appointed counsel who twice amended Appellant's petition. Eventually, however, the court dismissed the petition without a hearing on August 8, 2011. This Court affirmed the dismissal of Appellant's petition on November 26, 2013 and our Supreme Court denied Appellant's petition for allowance of appeal on May 8, 2014. Commonwealth v. McMillan, 91 A.3d 1296 (Pa. Super. 2013) (unpublished memorandum), appeal denied, 91 A.3d 162 (Pa. 2014).

Appellant, acting pro se, filed a second PCRA petition on or around September 29, 2014. Counsel was appointed and filed an amended petition. On March 3, 2015, the PCRA court dismissed the petition as untimely. A panel of this Court affirmed the dismissal order on August 5, 2015. Commonwealth v. McMillan, 131 A.3d 84 (Pa. Super. 2015) (unpublished memorandum).

On February 24, 2016, our Supreme Court granted Appellant's petition for allowance of appeal, vacated the order of this Court, and remanded this matter pursuant to Montgomery v. Louisiana, 136 S.Ct. 718 (2016) (declaring Miller v. Alabama, 568 U.S. 460 (2012) to apply retroactively). Commonwealth v. McMillan, 132 A.3d 981 (Pa. 2016) (per curiam).

Upon remand, the trial court scheduled resentencing. On October 26, 2017, the court imposed a new sentence of 30 years to life imprisonment for Appellant's second-degree murder conviction. A consecutive sentence of ten to 20 years' imprisonment was imposed for the robbery conviction.[2] An additional consecutive sentence of two and one-half to five years was imposed for Appellant's firearm conviction. In total, Appellant's newly imposed aggregate sentence is now 42½ years to life in prison. Post-sentence motions were denied by operation of law on March 9, 2018.

Appellant raises the following claims in his brief:

I. The trial court erred in determining that [it] was obligated to impose a sentence that included a term of life imprisonment, rather than imposing a minimum and maximum sentence for a term of years.

II. The trial court erred in denying counsel's request for funding to prepare a sentencing mitigation report in advance of this juvenile life without parole resentencing.

III. The trial court impermissibly thwarted [Appellant's] right of allocution by interrupting throughout and directing that counsel should have directed [Appellant's] statements to the [c]ourt.

IV. The trial court failed to consider and to verbalize [its] analysis of the relevant factors prior to imposing a life sentence.

Appellant's Brief at 6.

Appellant's first claim asserts that, with respect to his conviction for second-degree murder, the trial court erred in imposing a sentence of 30 years

_____

[2] No further penalty was imposed for Appellant's aggravated assault conviction.

to life in prison, rather than a fixed term of years as a maximum sentence. Appellant claims that such a sentence is unlawful and in violation of the constitutional prohibition against cruel and unusual punishments. See Appellant's Brief at 18-19. Appellant reasons that the imposition of a sentence involving life on parole is a severe punishment that subjects juvenile homicide defendants to a constant threat of lifetime confinement, subject to the discretion of the parole board. See id. Appellant also maintains that the imposition of life sentences, even with the possibility of parole, may constitute de facto life sentences in contravention of the holding in Miller. Id.

A claim challenging a sentencing court's legal authority to impose a particular sentence implicates the legality of a sentence. Commonwealth v. Batts, 163 A.3d 410, 434 (Pa. 2017). Issues concerning the legality of a sentence raise questions of law over which our standard of review is de novo and our scope of review is plenary. Commonwealth v. Diamond, 945 A.2d 252, 256 (Pa. Super. 2008), appeal denied, 955 A.2d 356 (Pa. 2008).

It is now well settled in Pennsylvania courts that juvenile defendants convicted of second-degree murder before 2012 (and for whom sentences of life without parole are inappropriate) are subject to mandatory maximum sentences of life imprisonment accompanied by a minimum term of years to be determined by the trial court. See Commonwealth v. Olds, 192 A.3d 1188, 1195 (Pa. Super. 2018) ("juveniles convicted of second-degree murder prior to June 25, 2012 ... must be sentenced to a maximum period of life imprisonment; however, they are eligible for parole after a term-of-years

specified by the trial court"); Commonwealth v. Machicote, 172 A.3d 595, 602 (Pa. Super. 2017) (trial court had authority to impose sentence of 30 years to life imprisonment upon juvenile defendant convicted of second-degree murder before 2012), appeal granted, 186 A.3d 370 (Pa. 2018). In view of this binding case law, Appellant is not entitled to relief on his first claim.

Appellant's second claim asserts that the trial court abused its discretion in denying Appellant's request for funds to retain a mitigation expert to assist counsel in gathering information for use in mitigating Appellant's sentence. In support of this claim, Appellant explains that there is no dispute that he is indigent, that the use of mitigation experts is common in similar cases throughout the Commonwealth, and counsel had no obligation to divulge the mitigation evidence that an expert would explore. This claim merits no relief.

> It is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. Commonwealth v. Curnutte, 871 A.2d 839, 842 (Pa. Super.2005). The state has an "affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them." Commonwealth v. Sweeney, 533 A.2d 473, 480 (Pa. Super. 1987). Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense. Ake v. Oklahoma, 470 U.S. 68 (1985).
>
> However, "[t]he provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the court and a denial thereof will not be reversed absent an abuse of that discretion." Commonwealth v. Cannon, 954 A.2d 1222, 1226 (Pa. Super. 2008) (citations omitted).

Commonwealth v. Konias, 136 A.3d 1014, 1019 (Pa. Super. 2016), appeal denied, 145 A.3d 724 (Pa. 2016).

As the trial court found, Appellant in this case did not identify the conditions or circumstances a mitigation expert would review, the records such an expert would consider, or the type of mitigation evidence an expert would develop. Generally speaking, expert testimony is admissible in Pennsylvania only when the expert's skill, experience, knowledge, and training will aid the factfinder in assessing a fact at issue. See Commonwealth v. Batts, 163 A.3d 410, 455-456 (Pa. 2017). In the absence of information concerning the nature and scope of a proposed expert's testimony, we perceive no abuse of the trial court's discretion in denying Appellant's request.

Appellant's third claim asserts that the trial court improperly interfered with Appellant's right of allocution by interrupting Appellant and suggesting that counsel assist in directing Appellant's statements to the court through the use of questions posed to Appellant. This claim fails.

Under Pa.R.Crim.P. 704(C)(1), "[a]t the time of sentencing, the judge shall afford the defendant the opportunity to make a statement in his or her behalf and shall afford counsel for both parties the opportunity to present information and argument relative to sentencing." Pa.R.Crim.P. 704(C)(1). The failure to offer a criminal defendant the right to address the court requires reversal. See Commonwealth v. Thomas, 553 A.2d 918, 919 (Pa. 1989).

However, "in order to preserve a claim of error pertaining to the right of allocution, the defendant must raise the claim before the trial court at the time of sentencing or in a post-sentence motion, or suffer waiver of the claim on appeal." Commonwealth v. Hardy, 99 A.3d 577, 579 (Pa. Super. 2014), citing Commonwealth v. Jacobs, 900 A.2d 368, 372 (Pa. Super. 2006) (en banc).

Our review of the record indicates that Appellant did not raise the allocution error he asserts before the trial court or in a post-sentence motion. He has, thus, waived the issue.

Moreover, even if he had not waived the issue, we would conclude Appellant's challenge is without merit. At his resentencing hearing, Appellant had the opportunity to address the court and spoke at length on his own behalf. During his presentation to the court, however, Appellant strayed onto topics that had little, if anything, to do with mitigation of his sentence. For example, Appellant made several statements that appeared to challenge the jury's conclusion that Appellant killed Smoot during the course of a robbery. When this occurred, the trial court interjected to redirect Appellant's presentation toward the issue of mitigation. Ultimately, the court acknowledged Appellant's declaration of acceptance of responsibility for his offenses. In view of the record, we are unable to conclude that the trial court improperly interfered with, or denied, Appellant's right of allocution. Thus, no relief is due.

In his final claim, Appellant challenges the discretionary aspects of his sentence, claiming that the trial court failed to articulate on the record the reasons for the sentence it imposed.

> With regard to the discretionary aspects of sentencing, there is no automatic right to appeal and before this Court may reach the merits of a challenge to the discretionary aspects of a sentence, we must engage in a four part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.… [I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

Commonwealth v. Disalvo, 70 A.3d 900, 902 (Pa. Super. 2013) (citations omitted).

Appellant has satisfied the first three requirements: he timely filed a notice of appeal, he sought reconsideration of his sentence in a post-sentence motion, and he has included a Rule 2119(f) statement in his brief to this Court. We now consider whether he has raised a substantial question for our review.

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. Commonwealth v. Paul, 925 A.2d 825, 828 (Pa. Super. 2007). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing

process."  Commonwealth v. Griffin, 65 A.3d 932, 935 (Pa. Super. 2013) (citation and quotation marks omitted).

In his 2119(f) statement, Appellant contends that the court "imposed the life sentence with possibility of parole yet failed to articulate any reasons for electing this harsh sentence on the record, and without considering the specific circumstances and needs of [Appellant]."  Appellant's Brief at 9. Because this claim asserts that the trial court's actions were inconsistent with the Sentencing Code, it raises a substantial question.  See 42 Pa.C.S.A. § 9721(b) ("In every case in which the court imposes a sentence for a felony or a misdemeanor, the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed.").

Having concluded that Appellant raises a substantial question, we proceed to the merits of his discretionary sentencing challenge.  We review such claims under the following standard.

> If this Court grants appeal and reviews the sentence, the standard of review is well-settled:  sentencing is vested in the discretion of the trial court, and will not be disturbed absent a manifest abuse of that discretion.  An abuse of discretion involves a sentence which was manifestly unreasonable, or which resulted from partiality, prejudice, bias or ill will. It is more than just an error in judgment.

Commonwealth v. Malovich, 903 A.2d 1247, 1252–1253 (Pa. Super. 2006) (citations omitted).

Our review of the sentencing transcript reveals that the trial court did not abuse its discretion. Where, as here, the sentencing court had the benefit of a pre-sentence investigation report, it is presumed to have considered all relevant information. Commonwealth v. Boyer, 856 A.2d 149, 154 (Pa. Super. 2004). Further, our Supreme Court has directed that the trial courts consider the sentencing requirements codified at 18 Pa.C.S.A. § 1102.1 in fashioning a sentencing scheme for a juvenile homicide offender post-Miller. Commonwealth v. Batts, 66 A.3d 286, 297 (Pa. 2013). Subsection 1102.1 provides, in relevant part, as follows.

> (c) Second degree murder.—A person who has been convicted after June 24, 2012, of a murder of the second degree, second degree murder of an unborn child or murder of a law enforcement officer of the second degree and who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:
>
> (1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of imprisonment the minimum of which shall be at least 30 years to life.

18 Pa.C.S. § 1102.1(c).

The trial court, in fixing Appellant's sentence of 30 years to life, considered subsection 1102.1(c)(1), Appellant's rehabilitative needs, the protection of the public, and the impact of Appellant's crimes on the victim and the community. The court also considered Appellant's age at the time of the offense and the degree to which he accepted responsibility for the killing.

Based on the totality of the circumstances, and because Appellant's sentence complies with subsection 1102.1(c)(1) and the precedents of our Supreme Court, we find no grounds on which to award relief to Appellant.[3]

Application for relief denied.  Judgment of sentence affirmed.

Bender, P.J.E., joins.

Gantman, P.J., concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/13/2019

_____

[3] On December 3, 2018, Appellant filed a pro se application for relief seeking a stay of this appeal.  By order entered on December 14, 2018, this Court forwarded Appellant's application to counsel pursuant to Commonwealth v. Jette, 23 A.3d 1032 (Pa. 2011).  Counsel has not responded.  Accordingly, we deny Appellant's application for relief.